Kim M. HULSEY, Employee–Appellant,

v.

**HAWTHORNE RESTAURANTS, INC., Employer–Respondent,**

and

**Argonaut Great Central Insurance Company, Insurer–Respondent.**

No. ED 89880.

Missouri Court of Appeals, Eastern District, Division One.

Nov. 27, 2007.

---

**2.** Emphasis added.

Lawrence O. Willbrand, St. Louis, MO, for appellant.

Michael Margherio, St. Louis, MO, for respondents.

KENNETH M. ROMINES, Judge.

### Introduction

This is a worker's compensation case. Here, we consider whether sufficient substantial and competent evidence exists to support the Labor and Industrial Relations Commission's ruling that Kim Hulsey's ("Hulsey") work-related fall on 1 December 2000 was not a substantial factor in causing the need for Hulsey's fusion surgery, which Hulsey received on 14 May 2004. We affirm the unspectacular proposition that the Commission is the finder of fact and may choose to believe one of two experts.

### Factual and Procedural Background

Hulsey has worked as either a waitress or as a bartender since the age of sixteen. Prior to her work injury on 1 December 2000, she had been working for a year and

a half as a waitress at Hawthorne Restaurants. On the day of her work injury, Hulsey was standing on a chair at the restaurant putting up Christmas decorations with a staple gun. She attempted to step onto the arm of the chair for leverage and the chair flipped, causing her to fall to the floor. Hulsey recalls suffering from a bad burning sensation on her right side and right hip, but she continued to work for another hour before going home. Hulsey returned to work the following Tuesday despite still experiencing pain into her back and hip.

Hulsey claims that she had good days and bad days thereafter. She was still experiencing pain around Christmas of 2000, when she requested medical treatment from Kathy, one of the owners of the restaurant. Kathy denied this request.

A neighbor referred Hulsey to Dr. Tessier, who performed the first medical evaluation of Hulsey after her accident on 11 January 2001. Dr. Tessier concluded that Hulsey suffered from "mechanical low back pain with possible lower lumbar disc protrustion." In his notes of 11 January 2001, Dr. Tessier noted that straight leg raise exam was negative bilaterally, and that the tenderness complained of was "in the right sacroiliac region with some mid tenderness at the sciatic notch on the right side only." Dr. Tessier advised Hulsey to remain off of work from 1 January 2001 to 22 January 2001. When Hulsey informed her employer that she would not be able to come into work for a week, she was terminated.

According to the record, Hulsey's next treatment was not until 16 July 2001, when Hulsey returned to Dr. Tessier with ongoing complaints of an aching pain in the back of her pelvis, and a numb sensation down the right lower extremity into the feet. The medical records indicate that on 23 July 2001 Hulsey had both an MRI of the lumbar spine and of the pelvis. The MRI states, in part: "Degenerative disk disease predominates at the L5–S1 level. There is a focal disk protrusion or herniation centrally within the canal, which may lateralize slightly to the left of midline." The MRI of the pelvis was interpreted as showing no specific·sacroiliac pathology. On 26 July 2001, upon reviewing the results of the MRI, Dr. Tessier suggested epidural steroid injection. Dr. Tessier then referred Hulsey to Dr. Sohn for further treatment.

On 8 January 2002, Hulsey met with Dr. Sohn, who diagnosed her with sacroiliitis and myofascial pain syndrome. He prescribed physical therapy, medication, and administered a trigger point injection.

Dr. Raymond F. Cohen met with Hulsey on 28 February 2002, took a history of injury and complaint, reviewed certain medical records, and performed a physical examination. Dr. Cohen concluded that Hulsey suffered from a lumbar disc protrusion at L5–S1, a right lumbosacral myofascial pain disorder and a right lumbar radiculitis, all of which he related to the injury at work on 1 December 2000. Dr. Cohen recommended that Hulsey have a lumbosacral and pelvic bone scan; a lumbar myelogram CT; and a lower extremity EMG NCD. In the event the testing was negative, he would further recommend treatment by epidural steroid injection, physical therapy, and medication. Dr. Cohen ruled out a surgical option in the absence of any definite radicular findings.

The next medical record in evidence was not until 22 June 2002, when Hulsey presented to the emergency room at St. Luke's Hospital with complaints of severe right sided low back and right hip pain. Hulsey was attempting to remove some feline feces from the carpet with a towel when her back "went out" and she was unable to straighten up. X-rays of the

lumbar spine showed no fracture or subluxation. Hulsey was treated and discharged that same day. Hulsey visited Dr. Tessier approximately two months later, during which Dr. Tessier discussed possible surgical intervention in the event epidural injections by Dr. Sohn did not work.

On 22 June 2003, Dr. David R. Lange, board certified in orthopedic surgery, performed an examination of Ms. Hulsey at the request of the employer's insurer. Dr. Lange solicited physical complaints from Hulsey, reviewed certain medical records, and performed a physical examination. Dr. Lange concluded that Hulsey suffered a right sacroiliac joint injury as a consequence of falling on one side of the pelvis. Dr. Lange concluded further that Hulsey had reached maximum medical improvement as of the date of his examination.

Two months after the evaluation with Dr. Lange on 22 June 2003, Hulsey met with Dr. David Raskas. Dr. Raskas took a history of complaint; reviewed certain medical records; had x-rays taken; performed a physical examination; diagnosed Hulsey as having discogenic pain at the L5–S1 level; and ordered a current MRI scan. An MRI of the lumbar spine was interpreted as showing "1. Multilevel degenerative disc and facet disease. Small focal central protrusion L5–S1. Mild protrusion lateralizes slightly to the right at L2–3. 2. Transitional first sacral segment."

On 9 April 2004, Dr. Raskas met with Hulsey to discuss various medical concerns, including as to the lumbar spine. Dr. Raskas notes that he reviewed the old lumbar MRI and states "She has some dehydration of her disks throughout the lumbar spine but the most collapsed significant one is what I would call the L5–S1 segment."

One week later, Hulsey had a myelogram and post myelogram CT of both the cervical and lumbar spines. The report as to the post myelogram CT of the spine speaks for itself. The only finding noted in the section entitled "Impression" is as to a "very mild stenosis at L3–4 and L4–5."

In his 23 April 2004 report, Dr. Raskas states that he reviewed the CT of the lower spine, and notes, "The L4–5 disk bulges quite a bit. The L5 and what I'll call transitional vertebra does its most collapse and is really degenerative." [sic]. Dr. Raskas recommended the fusion surgery that he performed with the assistance of Dr. Arenos on 14 May 2004.

The operative report indicates that Dr. Raskas performed a complete discectomy and anterior lumbar interbody fusion of L5–S1 and L4–5. Subsequent to that operation, Hulsey suffered groin pain and swelling in her left lower extremity. Doppler ultrasounds indicated a deep venous thrombosis in the proximal, femoral, and iliac vessels.

Studies suggested that Hulsey had developed blood clots in her left iliac vein and in the left common femoral artery. Hulsey was put on anticoagulants. Hulsey was further treated for her venous condition by placement of a filter, and a stent in the left common iliac vein.

Hulsey testified that she continued to treat with Dr. Greco, who actively monitored her use of blood thinning medication.

Dr. Cohen had the opportunity to meet with Hulsey again on 5 October 2004, approximately 5 months after her fusion surgery. Dr. Cohen became aware of the development of a deep vein thrombosis in the left leg post the surgery, and of ongoing care provided by Dr. Greco. Dr. Cohen concluded that the work trauma suffered on 1 December 2000 caused the need for the fusion surgery and was also the cause of the deep vein thrombosis, inas-

much as the DVT was a result of the fusion surgery.

Dr. Cohen acknowledged that one of the findings contained in the operative notes of Dr. Raskas suggests the presence of severe degenerative disc disease at L5–S1 and L4–5. When asked as to the significance of such a finding, he notes:

That compared to her initial MRI scan done in July of '01 and the operation several years ago and going along with her history of progression of the severe back pain, that the disc space had progressively lost its space. In other words, it had gone lower or collapsed and would have been consistent with her ongoing complaints of pain, that once that process had started and the disc protruded, it no longer could support that disc space between L5 and S1.

Dr. Cohen acknowledges that it is extremely unlikely for a patient the age of Hulsey to have as much disc space narrowing in the absence of trauma. He further states, "So if a patient has a history of significant back trauma and has an MRI and as time goes by and the back pain gets worse and then shows collapse of that disc space, then more likely than not the trauma is what caused the need for the surgery."

In November of 2004, Dr. Lange was provided with records relating to Hulsey's spinal fusion surgery. Dr. Lange also had the opportunity to see Hulsey on 23 June 2005. Dr. Lange notes that Hulsey completed a pain drawing that indicated that she still had right low back symptoms, right leg complaints, and similar pain levels to what she had indicated after completing the same form while seeing Dr.

Lange in 2003. Dr. Lange acknowledged that his diagnosis of sacroiliac joint injury could be proved to be incorrect in the event that the fusion surgery performed on Hulsey had the effect of resolving her pain complaints.

Regarding the finding of disc herniation at L5–S1, Dr. Lange notes that Hulsey had a small disc herniation centrally located and extending to the left, asymptomatic side. He notes that such disc herniation was not treated by the fusion surgery had by Hulsey, inasmuch as the herniation is posterior into the canal, and would require a posterior approach. Dr. Lange, when advised that the surgery involved an anterior retroperitoneal approach, noted that the surgery had by Ms. Hulsey was to remove the inside disc to effect fusion, and was not to treat the herniation, which would not have been seen by this anterior approach.

On 2 November 2006, the Administrative Law Judge held that the work injury suffered on 1 December 2000 was not a substantial factor in causing the need for Hulsey's fusion surgery at L5–S1 and L4–L5 of the low back.

On 7 June 2007, with one member dissenting,[1] the Labor and Industrial Relations Commission affirmed the administrative law judge's ruling, asserting that the award was supported by competent and substantial evidence. Hulsey appeals the ruling of the Labor and Industrial Relations Commission to this Court.

### Discussion

■ It appears from Hulsey's ill-drafted brief[2] that the sole issue on appeal is

---

1. Chairman William F. Ringer and Member Alice A. Bartlett affirmed while Member John J. Hickey dissented.

2. Hulsey's Brief has an "Introduction" section preceding the Statement of Facts which contains facts and argument which do not have specific page references to the legal file or the transcript in violation of Rule 84.04(i).

whether substantial and competent evidence exists to support the Commission's ruling that Hulsey's 1 December 2000 work-related fall was not a substantial factor in causing the need for Hulsey's fusion surgery.

On appeal from a decision in a worker's compensation case, we may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts founds by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award. Section 287.495.1 RSMo 2000.

■ We must examine the record as a whole to determine if sufficient substantial and competent evidence exists to support the award, or whether the award is contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003).

■ The employee has the burden of proving, to a reasonable probability, that her injury resulted from the accident to which she attributes it. *Silman v. William Montgomery Associates*, 891 S.W.2d 173, 175 (Mo.App. E.D.1995) (overruled on other grounds). Proper opinion testimony as to causal connection is competent and can constitute substantial evidence. Id. at 176. We are not to review the weight the administrative law judge gave to expert opinions if each was based on competent and substantial evidence. *Smith v. Climate Engineering*, 939 S.W.2d 429, 431 (Mo.App. E.D.1996) (overruled on other grounds); *see also Johnson v. Denton Construction Co.*, 911 S.W.2d 286, 288 (Mo.1995) (holding the decision to accept one of two conflicting medical opinions is an issue of fact for determination by the Commission). Our task is a single determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the award. This standard would not be met in the rare case when the award is contrary to the overwhelming weight of the evidence. *Hampton*, 121 S.W.3d at 223. If there is substantial and competent evidence in the record, albeit in conflict with other evidence, this Court is required to affirm the final award of the Commission. *Mueller v. Bay*, 670 S.W.2d 129, 131 (Mo.App.E.D. 1984).

Here the Commission had the opinions of two experts on which to base its decision, Dr. Cohen and Dr. Lange. It chose to rely on Dr. Lange. Hulsey argues that the Commission's decision to believe Dr. Lange was not based on sufficient competent evidence in the record and was contrary to the overwhelming weight of the evidence in that the only evidence of Dr. Lange's finding was premised on Dr. Lange's deposition testimony that the "mechanism of injury" was consistent with

---

Further, Hulsey's "Introduction" and Statement of Facts are argumentative in that they contain numerous underlined words and phrases, thus violating Rule 84.04(c). Compliance with the briefing requirements under Rule 84.04 is mandatory. *Bishop v. Metro Restoration Services, Inc.*, 209 S.W.3d 43, 45 (Mo.App. S.D.2006). Perfection is not required, but an appellant must reasonably comply with the rules. *Hicks*, 41 S.W.3d at 640. The failure to substantially comply with Rule 84.04 preserves nothing for appellate review and warrants dismissal of the appeal. *Id.*; *Brown*, 211 S.W.3d at 147; *Bishop*, 209 S.W.3d at 48; *Thornton*, 161 S.W.3d at 920. While we chose not to dismiss this case, that fact should not diminish the importance of Rule 84.04.

a sacroiliac joint injury, and that Dr. Lange did not opine that Husley did not need the surgery on her spine. We disagree.

We first dispense with Hulsey's argument that Dr. Lange's opinion does not constitute sufficient competent evidence. Proper opinion testimony as to causal connection is competent and can constitute substantial evidence. *Silman,* 891 S.W.2d at 176. Dr. Lange is a spine surgeon by training and experience. He examined Hulsey on 22 June 2003, and concluded that Hulsey suffered a right sacroiliac joint injury as a consequence of falling on one side of the pelvis. Dr. Lange further concluded that Hulsey had reached maximum medical improvement as of the date of his examination. Dr. Lange acknowledged that his diagnosis of sacroiliac joint injury could be proved to be incorrect in the event that the fusion surgery performed on Hulsey had the effect of resolving her pain complaints.

Hulsey had the fusion surgery performed in May 2004 and thereafter presented to Dr. Lange in November 2004 and again in June 2005. During her visits with Dr. Lange, Hulsey continued to complain of low back and leg pain. She additionally drew a pain diagram in which she indicated that she still had right low back symptoms and right leg complaints, and similar pain levels to what she had indicated after completing the same pain diagram with Dr. Lange in 2003. Under *Silman,* Dr. Lange's opinion is competent and substantial evidence.

We also disagree with Hulsey's claim that Dr. Lange's opinion is against the overwhelming weight of the evidence. While there was substantial evidence to support Dr. Cohen's conclusion that Hulsey's fall necessitated the fusion surgery, the evidence is not so overwhelming as to require a reversal. Dr. Lange and Dr. Cohen are both experts in their field who gave differing opinions. Both opinions were based on substantial and competent evidence in that they were based on an evaluation of the patient's history and symptoms.

The Commission is free to believe whatever expert it chooses as long as each opinion is based on substantial and competent evidence, and we should not disrupt that, even if the competing expert is worthy of belief. *Smith v. Climate Engineering* at 431; *Mueller v. Bay* at 131. The Commission chose to believe Dr. Lange's opinion that the work-related injury was to the right hip, and that Hulsey was at maximum medical improvement before the surgery. Dr. Berkin, who had the opportunity to evaluate Hulsey a little over two years after the fall, also opined that Hulsey was not a surgical candidate. Dr. Lange's opinion was not against the overwhelming weight of the evidence.

### Conclusion

Upon review of the entire record, it is clear to this Court that sufficient substantial and competent evidence exists to support the Commission's award and the award is not contrary to the overwhelming weight of the evidence. We therefore affirm the ruling of the Labor and Industrial Relations Committee.

AFFIRMED.

KATHIANNE KNAUP CRANE, P.J., and ROBERT G. DOWD, JR., J., concur.